William A. Barber and Melanie G. Barber v. Commissioner.
Barber v. Commissioner
Docket No. 3156.
United States Tax Court
1945 Tax Ct. Memo LEXIS 325; 4 T.C.M. (CCH) 104; T.C.M. (RIA) 45045; January 25, 1945
*325 Milton B. Ignatius, Esq., for the petitioners. J. Richard Riggles, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined a deficiency in income tax for the year 1941, in the amount of $9,809.95. The only question is whether petitioner is entitled to a long-term capital loss from the alleged sale of alleged capital assets in the taxable year. Petitioner contends that he sustained a loss of $192,956.28 from the sale of 2,500 shares of Childs Company preferred stock, of which, one-half, or, $96,478.14, is claimed as a capital loss deduction. Petitioner and his wife, Melanie G. Barber, filed a joint return for 1941 with the collector for the second district of New York. Findings of Fact William A. Barber, hereinafter referred to as petitioner, resides in New York City. He kept his books and filed his return for the taxable year on a cash receipts and disbursements basis. He is a lawyer, having been a member of the bar of the State of New York for over forty years. In 1941, he was a member of a partnership, Barber and Grunden. Childs Company, a corporation, carries on a restaurant business, and *326 owns subsidiary companies which carry on the same type business. Petitioner has been a director of Childs Company since 1925, and he has served as chairman of the board of directors since 1930 up to the present time. Prior to 1929, he acquired 30,000 shares of Childs common stock. Subsequently, his holdings of common stock diminished to 15,000 shares. Albert H. Wiggin; formerly president of Chase National Bank, is a friend of petitioner. In January 1937, petitioner and Wiggin had some discussions about Childs 7% cumulative preferred stock. At that time the accumulated unpaid dividends on this stock amounted to $35 per share. On January 25, 1937, petitioner sent Wiggin a draft of a letter "to cover the subject of our conversation on Saturday," requesting Wiggin's approval or suggestions for revisions. Petitioner's letter is as follows: "Dear Al; "Confirming our understanding with respect to the Joint Account in Childs Company Preferred Stock as follows: "You are to purchase through such broker or brokers as you may select and at such prices as you may determine, Childs Company Preferred in an amount not exceeding Five thousand (5000) shares unless this amount is enlarged by *327 mutual consent. "This stock is to be carried by you for not exceeding one year, and I am to have one-half of any profit accruing to the account, less interest charge at the rate of five per cent (5%) per annum for carrying my portion. "You may purchase and sell for this account in your discretion and I am to be notified before the end of each month the number of shares bought and sold. This to enable me to make necessary reports, I being a director in the Company. "If this is satisfactory I shall thank you to confirm." On the same day, Wiggin sent the following letter to petitioner: "Dear Bill; "I beg to acknowledge yours of the 25th instant. Your statement of the understanding in respect to the Joint Account in Childs Company Preferred Stock is correct, and I beg to confirm." Thereafter, Wiggin purchased 2,500 shares of Childs' cumulative preferred stock, from February 1, 1937 to June 8, 1937, at a cost of $215,456.28. He expended a total amount of $215,456.28 for the stock out of his own funds. Petitioner did not advance any money for the purchase of the stock. He did not give any notes to Wiggin or to the broker. The certificates for the stock were issued in the name *328 of Evans, Stillman & Co., a firm of brokers. At no time did any certificates stand in petitioner's name. Wiggin opened an account with Evans, Stillman in the name of petitioner, and the broker's purchase slips showed petitioner's name in the space left for the name of the account. Petitioner did not have any contacts with the broker and he did not know what Wiggin's arrangements with the broker were. The broker made purchases solely upon Wiggin's instructions, they sent the bills to him, and they looked to Wiggin for payment. The broker's purchase slips were sent to Wiggin's office, and his secretary sent the slips to petitioner along with a letter showing the purchases made each month. Purchases were made by Wiggin in each month, January to June, inclusive, in 1937. Thereafter, no further purchases were made and none of the stock was sold. None of the 2,500 shares of preferred stock had been sold over the counter or on the market throughout the period ending December 30, 1941. No dividends were paid on the stock during the period 1937 to 1941, inclusive. In 1937, petitioner was indebted to banks and others in a total amount of close to one millon dollars. His indebtedness remained *329 that amount, or more, in 1941. From 1934 through 1937, Childs Company earned profits increasing from $35,000 a year to $719,000. The Company sustained losses in 1938, 1939, and 1940, in the amounts of about $756,000, $273,000, and $719,000, respectively. On December 3, 1941, Wiggin's secretary sent the following letter to petitioner: "Referring to your indebtedness to Mr. Wiggin which amounts to $215,456.28, excluding interest, to secure which, he holds as collateral 2500 shares of Childs Company preferred stock, Mr. Wiggin has requested me to advise you that in view of your obvious inability to pay the debt, as disclosed by the financial data with which you furnished him last Summer, and in view of the present market value of the collateral, he has decided that it would be best to terminate the account, which may be done either by a sale of the collateral in the market, or by Mr. Wiggin taking over the collateral for his own account at the market, and by crediting the indebtedness with the proceeds. It is agreeable to Mr. Wiggin to take over the collateral at the market. The price at which the stock last sold on the New York Curb Exchange yesterday was 9. On the basis of a *330 valuation of 9, the proceeds of the collateral would be $22,500 which, applied against your indebtedness, would reduce it to $192,956.28. If it is agreeable to you that Mr. Wiggin acquire the stock at the above figure, crediting your indebtedness accordingly, I suggest that you sign the enclosed consent and send it to Mr. Wiggin." On December 4, 1941, petitioner signed and returned to Wiggin the "consent" which read as follows: "Referring to my indebtedness to you in the amount of $215,456.28, plus interest, as collateral for which you hold 2500 shares of Childs Company preferred stock, I hereby consent to the purchase by you of the above mentioned shares at the current market price of $9 a share, the proceeds of $22,500 to be credited against the amount of my indebtedness, which will then be $192,956.28. I understand that you will purchase and affix the necessary Federal and State stock transfer stamps in this connection." Petitioner has never made any payment to Wiggin in connection with the stock purchased by Wiggin in 1937. Wiggin has never instituted any legal action against petitioner. In his income tax return for 1941, petitioner reported the sale of Childs Company preferred *331 stock for $22,500, and a loss of $192,956.28. He deducted $96,478.14, as a net long-term loss from the sale of a capital asset. Respondent disallowed the deduction. Gross income was reported in the return in the total sum of $35,409.71, and deductions were claimed in the total amount of $4,486.28, leaving net income of $30,923.43, exclusive of the claim for a net capital loss. The loss claimed upon the alleged sale of Childs Company preferred stock wiped the net income and resulted in a report in the return of a loss for the year of $65,554.71. The agreement between petitioner and Wiggin, made on January 25, 1937, was an agreement under which Wiggin agreed to purchase at prices he determined not exceeding 5,000 shares of Childs Company preferred stock, which he was to carry, and over which he had full control. Wiggin did not loan petitioner the capital with which to purchase the stock, and petitioner did not purchase the stock. Under the agreement petitioner's interest was limited to the right to receive one-half of any profit accruing to the account, less a charge for interest. The agreement did not obligate petitioner to share in any loss and he did not receive the right to sell *332 stock out of the account. There was no bona fide sale of 2,500 shares of preferred stock by petitioner to Wiggin in December 1941. Opinion The pleadings in this proceeding present the question whether petitioner made a bona fide sale of 2,500 shares of the cumulative preferred stock of Childs Company to Albert H. Wiggin in December 1941. Petitioner contends that he owned the stock, sold it to Wiggin, and, as a result, sustained a loss from the sale of a capital asset. In the petition it is alleged that petitioner purchased the stock in 1937 at a cost of $215,456.28; that he owned the stock for more than four years; that he sold the stock on December 4, 1941, for $22,500, and that he sustained a loss of $192,956.28. Respondent entered a general denial of these allegations, and of others. The question is primarily a question of fact. Petitioner contends that he made an investment in the 2,500 shares preferred stock in the amount of the cost of the stock. The contention is founded upon his asserting now that the 1937 transaction with Wiggin, and Wiggin's purchases constituted a borrowing by him from Wiggin of $215,456.28. The burden of proof which is upon petitioner requires his *333 production of evidence to prove these contentions. He contends, further, that, having acquired the stock, he thereafter, in 1941, sold it to Wiggin. On this point, the burden upon petitioner is to prove that there was a bona fide sale to Wiggin at the close of 1941. The evidence is that on January 25, 1937, petitioner and Wiggin entered into an agreement. The agreement is clear in most respects. It is controlling. It represents the understanding of the parties following which Wiggin bought the stock. Under that agreement, petitioner was to share in the profits of an account in the preferred stock, if any were realized, and that is all. His share of the profits was fixed at one-half, less a charge "of 5 percent (5%) per annum for carrying my portion." This provision of the agreement has not been explained, but it does not affect the result which we believe must be reached. Nothing is said in the agreement to constitute petitioner as the principal and Wiggin as his agent, or to create an indebtedness in petitioner to Wiggin for the cost of all of the stock purchased, or of any part of the stock purchased, or to fix Wiggin's holding of the stock as a pledge of the stock by petitioner *334 to secure a loan to him from Wiggin. On the other hand, the agreement clearly provides that Wiggin agreed to purchase not more than 5,000 shares of preferred stock, through such broker and at such prices as he shall determine, and that Wiggin had the sole discretion over the making of sales as well as purchases in the account. The conduct of Wiggin under the agreement is material, as well as the financial status of petitioner at the time the agreement was made, and thereafter. Wiggin made the purchases out of his own funds, and he did not require or receive any advances of cash or collateral from petitioner. Petitioner never has given Wiggin any note or notes. Wiggin selected the broker and had all of the dealings with him. Petitioner neither placed nor confirmed orders to buy. The brokers sent the bills and purchase slips to Wiggin and they looked to him only for payments and for directions. No certificates for stock were ever issued in the name of petitioner. Cf. . There is no evidence here, as there was in the Webb case, that petitioner ratified the broker's dealings, or did such other thing so as to become the broker's principal. *335 Petitioner testified that he did not know anything about Wiggin's arrangements with the brokers. The mere fact that the purchase slips bear petitioner's name as the name of $&107 the account is not sufficient to establish that petitioner borrowed $215,456.28 from Wiggin in 1937, which petitioner now attempts to establish. See . From the time the stock was purchased until the present time, the stock has been under Wiggin's control. Although he agreed to "carry" the stock for only one year, he carried the stock for several years, and there is no evidence that there was any change in the terms of the agreement of January 25, 1937, after the expiration of one year. There is no evidence that petitioner ever exercised any control over the stock or gave the brokers in whose name it stood any directions. In fact, the testimony of petitioner shows that he did not. Under the agreement of January 25, 1937, petitioner was to receive one-half of any profit, i.e., profit from sale of the stock or profit accruing to the account in any way, but the agreement is silent on the point of losses. Wiggin and petitioner were friends. Presumably he knew *336 in January 1937, that petitioner was deeply indebted to banks and others to the extent of one million dollars. Between then and the end of 1941, that indebtedness was not reduced, but was increased by the running of interest. Wiggin himself did not testify in this proceeding. Therefore, his intent must be understood solely by the precise terms of the agreement be made in 1937. The reasonable conclusion to be drawn from that agreement is that he desired to give petitioner an opportunity to share in any profits he made in the account. In view of the financial distress of petitioner in 1937, and thereafter, it seems unlikely that Wiggin intended that petitioner should be "saddled with losses," and burdened with further indebtedness over and above that which petitioner carried and was unable to pay. Cf. The stock has not been sold on the market to outsiders to date, and so Wiggin's dealings in the stock have not been terminated. The only and first indication of the existence of an indebtedness in petitioner to Wiggin for the cost of the stock appears in the letters which were exchanged in December of 1941, which have been set forth in the findings *337 of fact. But we believe that the terms of the agreement which was made at the time the stock in question was purchased is entitled to greater weight than the letters which were written four years later at the time when the parties gave thought to the alleged sale of the stock to Wiggin, upon which petitioner relies to establish a loss. There is none of the usual type of evidence to show that from 1937 through 1941, Wiggin treated his purchases of the stock as giving rise to an account receivable from petitioner in the amount of the cost, or any other amount. The 1937 agreement uses the term, "Joint Account," and provides for an equal participation in profits. Such terms could imply, at the most, only an obligation upon petitioner to carry one-half of the cost of the stock purchased for the joint account. Petitioner does not aver that he was so obligated. Petitioner has not introduced any evidence to show that during the period up to December, 1941, he carried on his personal books and included in his reports to creditors any item of an account payable to Wiggin. Under all of the circumstances, and in the absence of other evidence of a debt, we think that the December letters are *338 not determinative of the question, and do not prove that petitioner owed Wiggin $215,456.28. It is concluded that petitioner was not indebted to Wiggin for the above stated sum, and that has been found as a fact. This brings us to the alleged sale of the stock to Wiggin. Petitioner's claim to a deduction for a loss is founded upon the contention that he owned the stock. His contention that he owned the stock is founded upon the further contention that he was indebted to Wiggin for the full purchase price thereof. The conclusion made above that petitioner was not indebted to Wiggin, requires the further conclusion that petitioner did not own the stock, and it is so held. We have made a finding of fact that he did not own the stock, upon the evidence presented. It follows that the alleged sale of the stock to Wiggin was not a bona fide sale of the stock by petitioner. Therefore, he did not sustain the claimed loss. It has been held that where there are two transactions, a borrowing of funds and a purchase of stock, a taxpayer on a cash basis is permitted to deduct a loss in the year th transaction in the stock is terminated, as by a sale or by the happening of the event of the *339 stock's becoming worthless, even though the borrower has not yet repaid the loan. , appeal dismissed . However, the facts do not bring this case within that rule. In the Larkin case, Larkin borrowed money from a bank and, ultimately, he became the purchaser of stock from third parties as a result of his borrowing, and the stock was transferred into his name. This Court said, "It is idle to contend that the bank 'was the party that had the real investment in the stock'" (p. 217). This Court said, further, "But petitioner and his associates were acquiring the stock, not through dealing with the bank but through dealing with 'the respective owners' of it. The other cases are likewise distinguishable in that in all of them the transactions giving rise to the loss had involved only the paye and the maker of the note and in none of them had there been a borrowing from a third party". (p. 220). Here the transaction was between petitioner and Wiggin only. The Larkin case followed , pointing out a belief that it was sound in principle and that it had not been over-ruled. However, *340 this Court endeavored to make clear a distinction between the situation in the Larkin and Weis cases, and the situation in other cases, particularly in ; ; ; . The distinction lay in the fact that, in the Larkin and Weis case the taxpayer actually entered into two transactions with two different parties. There were a borrowing of funds from B, and a purchase of stock from C. The term "third party borrowing cases" has been applied to the type of situation which was found to exist in the Larkin and Weis cases. Thus, in both of these cases A, the taxpayer, bought stock from C, the owner with funds borrowed from B. The rule applied in the Larkin and Weis cases is limited to the situation where there are "two transactions." On the other side of the line, are the Eckert, Rhode Island Hospital Trust Co., Tams, and Jenkins cases, where the taxpayer had entered into a single transaction with one other party, and the facts were opposed to finding that the transaction could be split *341 into two distinct transactions. To repeat part of the quotation from the Larkin case, from p. 220, set forth above, "the transactions giving rise to the loss had involved only the payee and the maker of the note and in none of them had there been a borrowing from a third party." It is our view that the question in this proceeding is controlled by the above cases, if it is not entirely controlled by the special facts in this case. We think that the evidence does not support findings of fact that petitioner borrowed $215,456.28 from Wiggin, that petitioner purchased 2,500 shares of the preferred stock, and that petitioner made a bona fide sale of the preferred stock to Wiggin in 1941. However, if such facts could be assumed, then the question would be whether petitioner sustained a deductible loss in 1941 in the amount of $192,956.28, when he had not contributed any cash to the transaction, and had not paid any cash in 1941, it being crucial that petitioner reports his income for taxation on a cash basis. Assuming the facts which petitioner urges to be facts, the situation would be clearly a two-party transaction as follows: A bought stock for $215,456.28 from a broker and thereafter *342 the broker was wholly outside the picture. B being insolvent or nearly insolvent, gave nothing to A, not even a note. Later B acknowledged indebtedness to A for the full cost of the stock, and A agreed to take the stock over as his own, and reduced B's debt to him by the then market value of the stock, B not advancing any cash to A at any time. Under such assumed facts, we cannot find that petitioner entered into two distinct transactions either in 1937 or in 1941. Therefore, the Weis and Larkin cases, and similar ones, do not control the question presented in this case. Cf. We do not locate any cases where the facts are the same or closely resemble the facts in this case, except There is some resemblance between the situation here and the situation in the Rhode Island Hospital Trust Co. case. In this case Wiggin stands very much in the same position as the broker did in the above case, and petitioner's position closely resembles that of a person with a "grossly under margined" account. There is the difference that in the case referred to for comparison, the broker sold certain stock, and that *343 sale gave rise to the claim by the taxpayer's representative that a loss was sustained in the year of the sale of the stock by the broker. Here, Wiggin did not sell the stock in 1941. But, passing over the differences in the facts, the situation in 1941, under the facts as assumed, arguendo, was such that the loss, brought about by the shrinkage of the market value of the Childs Company preferred stock, merely represented a "debt" due by petitioner to Wiggin, and until petitioner reimburses Wiggin, "there is no certainty that the customer and taxpayer will ever actually suffer a loss within the purview of the Revenue Act, * * *," (See ; especially when "the loss" is carried along from year to year in the form of petitioner's promise to "reimburse" Wiggin, which reimbursement may, or may not ever be paid, or which Wiggin may never see fit to force petitioner to make, (paraphrasing what was said in the Rhode Island Hospital Trust Co., case). There is no certainty here that petitioner will ever be able to make restitution to Wiggin for any loss he may eventually sustain when he disposes of the preferred stock. If petitioner *344 is liable to Wiggin for any sum, or for any loss which he may sustain eventually, then we would be compelled to hold that the mere promise of petitioner to reimburse Wiggin is not sufficient to permit a deduction on account of Wiggin's "taking over" the stock in 1941. The year in which petitioner may take a deduction will be the year in which his capital or income is actually reduced by some payment to Wiggin. Or, in another manner of speaking, assuming that there was a sale of the stock to Wiggin in 1941, giving rise to a loss, that loss became merely an obligation of petitioner, and petitioner cannot deduct "indebtedness" as a loss until he has actually discharged it. Respondent's determination is sustained. Decision will be entered for the respondent.